S. Peter Serrano
United States Attorney
Jacob E. Brooks
Frieda K. Zimmerman
Assistant United States Attorney
Gwendolyn Russell
Special Assistant United States Attorney
United States Attorney's Office
Eastern District of Washington
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:24-CR-140-TOR |
| Plaintiff, | |
| | UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS INDICTMENT FOR FAILURE TO STATE AN OFFENSE (ECF No. 178) |
| v. | |
| JOHN WESLEY OWENS, JOSHUA WESLEY OWENS, DIESEL TRUCK PRODUCTS, INC. d/b/a DPF DELETE SHOP, INC., FULFILLMENT SOLUTIONS & MORE, LLC, KEVIN PAUL DODD, EVOLUTION AUTO PERFORMANCE, EVO TUNES, INC., PHILIP JOHN SWEENEY, and KX WHEELS, | Hearing Date and Time: February 25, 2026 at 9:00 a.m. |
| Defendants. | |

The United States of America, by and through S. Peter Serrano, United States Attorney for the Eastern District of Washington, Jacob E. Brooks and Frieda K. Zimmerman, Assistant United States Attorneys, and Gwendolyn Russell, Special

UNITED STATES' RESPONSE TO MOTION TO DISMISS - 1

Assistant United States Attorney, respectfully submits the United States' Response to Defendants' Motion to Dismiss Indictment for Failure to State an Offense filed by Defendants John Wesley Owens, Joshua Wesley Owens, Diesel Truck Products, Inc. d/b/a DPF Delete Shop, Inc., and Fulfillment Solutions & More, LLC ("Defendants") (ECF No. 178).

## I.    INTRODUCTION

Defendants conspired to bring illegal aftermarket defeat devices into the United States for sale to customers to "delete" emissions control systems on their diesel trucks and tamper with the emissions monitoring systems on the trucks, resulting in a profit of over $70 million dollars. Based on this conduct, Counts 1 and 2 of the Indictment charge that Defendants conspired to tamper with and render inaccurate monitoring devices and methods required under the Clean Air Act, in violation of 18 U.S.C. § 371, 42 U.S.C. § 7413(c)(2)(C); and Defendants conspired to smuggle defeat devices that are illegal under the Clean Air Act from Canada into the United States, in violation of 18 U.S.C. § 371 and 18 U.S.C. § 545. ECF No. 1. Counts 3 through 5 are substantive smuggling charges, alleging Defendants knowingly, intentionally, and fraudulently imported and brought into the United States merchandise contrary to law and bought and sold that merchandise contrary to law, in violation of 18 U.S.C. § 545 and 18 U.S.C. § 2. ECF No. 1. Count 6 alleges money laundering with the proceeds of smuggling, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (h). ECF No. 1.

Defendants move this Court to dismiss all six counts of the Indictment. ECF No. 178. They first claim that the Clean Air Act tampering charges under 42 U.S.C. § 7413(c)(2)(C) must be dismissed because the Act does not criminalize the conduct alleged in the Indictment. However, this argument fails as the plain language of the Act authorizes felony penalties for persons who knowingly tamper with any monitoring device required to be maintained under the Act, which include onboard diagnostic systems ("OBDs") affected by the devices sold by Defendants.

Defendants' arguments regarding the smuggling charges arising under 18 U.S.C. § 545 also fail because 42 U.S.C. § 7522 clearly prohibits the sale, manufacture, and installation of defeat devices, making them "contrary to law" under § 545. Finally, Defendants' argument regarding the money laundering charge in Count 6 is predicated upon the other charges being dismiss, so this argument fails as well. Defendants' motion should be denied.

## II.    STANDARD OF REVIEW

An indictment need include only "a plain, concise, and definite written statement of the essential facts constituting the offense charged" and "the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." Fed. R. Crim. P. 7(c)(1). It is well settled that an indictment is "sufficient if: (1) it contains the elements of the offense charged and fairly informs the defendant of the charge against which he must defend; and (2) it enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Hill*, 279 F.3d 731, 741 (9th Cir. 2002) (citing *Hamling v. United States*, 418 U.S. 87 (1974)). Further, in reviewing a motion to dismiss an indictment for failure to state an offense, "the court must accept the truth of the allegations in the indictment in analyzing whether a cognizable offense has been charged." *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002).

## III.    LEGAL BACKGROUND

### A. Emission Standards

In 1963, Congress enacted the Clean Air Act (hereinafter "the Act"), in part, because "the increasing use of motor vehicles . . . has resulted in mounting dangers to the public health and welfare." 42 U.S.C. § 7401(a)(2). The Act has been amended multiple times since then as Congress attempted to address emerging developments in motor vehicle mechanics and emissions.

Subchapter II of the Act governs emissions standards for mobile sources of air pollutants, and Part A of that Subchapter specifically addresses motor vehicle

emissions. 42 U.S.C. §§ 7521-54. These provisions mandate the installation and maintenance of emission control devices on motor vehicles, the function of which is to reduce the emission of nitrogen oxides, particulate matter, carbon monoxide, non-methane hydrocarbons, and other air pollutants. 42 U.S.C. §§ 7521-7554.

The Act directs the Environmental Protection Agency (EPA) to establish emission standards for light-duty vehicles and trucks and diesel heavy-duty vehicles and engines. *See* 40 C.F.R. Part 86, Subparts A and S. To meet these requirements, vehicle manufacturers employ many elements of design, which include hardware and software control systems. 40 C.F.R. §§ 86.094-2, 1803-1, and 1844-01.

These elements of design include hardware devices which manage and treat exhaust to reduce levels of regulated pollutants from being created or emitted into the ambient air. For diesel-fueled motor vehicles, such devices typically include diesel particulate filters and exhaust gas recirculation systems, as well as diesel oxidation catalyst and selective catalytic reduction devices.

### B. Onboard Diagnostic Systems

The Act also directs EPA to create regulations requiring manufacturers to install onboard diagnostic (OBD) systems on vehicles and engines to ensure compliance with emission standards. 42 U.S.C § 7521(m)(1). Congress specified that OBD systems must be capable of 1) accurately identifying emission-related systems deterioration or malfunction which could cause a failure of the vehicle to comply with emissions standards; 2) alerting the vehicle's owner or operator to the need for maintenance or repair; and 3) storing and retrieving fault codes. *Id.*

Accordingly, EPA enacted regulations that require manufacturers to install OBD systems on heavy-duty and light-duty vehicles for model year 2008 and later. *See* 40 C.F.R. § 86.1806-05. The regulation states:

> [A]ll light-duty vehicles, light-duty trucks and complete heavy-duty vehicles weighing 14,000 pounds GVWR1 or less (including [medium duty passenger vehicles]) must be equipped with an onboard diagnostic (OBD) system capable of monitoring all emission-related powertrain

1  systems or components during the applicable useful life of the vehicle.

2  40 C.F.R. § 86.1806-5(a)(1). The OBD system must incorporate a malfunction

3  indicator light (MIL) that illuminates on the vehicle dashboard to alert the driver

4  when the OBD detects a malfunction. *Id.* at § 86.1806-05(c), (d). The OBD must

5  also record and store retrievable diagnostic trouble codes in the vehicle's computer

6  memory identifying any malfunction causing MIL illumination. *Id.* § 86.1806-05(e).

7  This helps in the detection and diagnosis of emissions-related malfunctions during

8  inspections and repairs.

9       Additionally, if the malfunction is significant and unresolved, the OBD may

10  shut down the truck or limit its top speed, an effect commonly referred to as "limp

11  mode." This provides an incentive for the driver to repair the vehicle.

12  **C. <u>Defeat Devices</u>**

13       An illicit industry has developed around removing or disabling emissions

14  control systems from on-road diesel trucks, known as a "deleting," and

15  reprogramming the OBD to prevent it from detecting the deletion of emission

16  controls, known as "tuning." ECF No. 1, ¶ 19-25. Tuning and deleting go hand in

17  hand, because without the tune, a deleted vehicle will not operate properly. Parts or

18  components used to delete and tune trucks include "straight pipes," "block plates,"

19  and electronic tuners with "delete tunes" (also known as "delete tuners"). *Id.*

20  Deleting and tuning a truck results in a dramatic increase in the pollutants emitted

21  by the vehicle. *Id.*, ¶ 20.

22       It is a prohibited under the Clean Air Act to manufacture or sell, or offer to

23  sell, or install, any part or component intended for use with, or as part of, any motor

24  vehicle or motor vehicle engine, where a principal effect of the part or component is

25  to bypass, defeat, or render inoperative emissions controls required under the Act,

26  where the person knows or should know that such part or component is being offered

27  for sale or installed for such use or put to such use (hereinafter, "defeat devices").

28  42 U.S.C. § 7522(a)(3)(B). *Id.*, ¶ 27. This merchandise, including what are referred

to as "defeat devices", is illegal to sell in the United States and is therefore "contrary to law." The merchandise at issue here was also imported in furtherance of a criminal conspiracy, further rendering it "contrary to law." It is a felony offense to import or bring into the United States any merchandise contrary to law. 18 U.S.C. § 545. Further, it is a felony offense to knowingly tamper with or render inaccurate any monitoring device required to be maintained under the Act. 42 U.S.C. § 7413(c)(2)(C).

## IV.    CASE OVERVIEW

Defendants Joshua Wesley Owens and his father John Wesley Owens owned and operated Diesel Truck Products, Inc. d/b/a DPF Delete Shop, Inc., an online business registered in Chelan, Washington. ECF No. 1, ¶ 8. Defendants' business sold defeat devices to customers in the United States who used the defeat devices to remove or disable emissions controls on their diesel trucks and reprogram the OBDs. *Id*. Defendant John Wesley Owens also operated Fulfillment Solutions & More, LLC, which received and stored the illegal merchandise in Manson, Washington, and then shipped it to customers. *Id.*, ¶ 9. Defendants purchased the defeat devices from co-defendants in Canada and smuggled the defeat devices into the United States. *Id.*, ¶ 10-14, 28-56.

As part of the business, Defendants not only sold delete tuners to tamper with OBDs on customers' diesel trucks, they provided instruction on uploading the delete tune files and removing or disabling emission control systems, and found solutions for customers who had issues installing the tunes. *Id.*, ¶ 43g-j, 43y, 43ff-rr. Defendants also repeatedly discussed the illegality of their conduct and intentionally sought to evade enforcement by EPA. *Id.*, ¶ 37-39, 43l-rr.

Even as other companies complied with the law and ceased selling defeat devices in the United States, Defendants continued to smuggle in the illegal products and sell them to customers to tune and delete their trucks. *Id.*, ¶ 36, 43l, n, v. Defendants earned tens of millions from their criminal scheme, all at a cost to the

public health. *Id.*, ¶ 4, 40. They also used these proceeds from smuggling defeat devices to further promote smuggling of the devices from Canada. *Id.*, ¶ 57-63.

Defendants repeatedly claim they have been charged criminally for "the sale of parts." EFC No. 178. This misconstrues the Indictment. Defendants indeed sold millions of dollars' worth of defeat devices. But that is not the basis of the charges. Defendants were charged criminally based on their conspiracy to tamper with OBDs on customers' trucks and smuggle the defeat devices into the country. ECF No. 1.

## V.    ARGUMENT

### A.    The Indictment Properly Charges the Criminal Offense of Conspiracy to Knowingly Tamper with a Monitoring Device that is Required to be Maintained Under the Act, 42 U.S.C. § 7413(c)(2)(C).

Defendants are properly charged with conspiracy to tamper with and render inaccurate monitoring devices and methods required to be maintained or followed under the Clean Air Act in violation of 42 U.S.C. § 7413(c)(2)(C). Defendants contend that the tampering counts should be dismissed because (1) § 7413(c)(2)(C) excludes violations which may be civilly enforced under Subchapter II of the Act (ECF No. 178 at 9-17, 23-27); (2) OBD systems are not "monitoring devices" (*Id.* at 21-22); and (3) OBD systems are not "required to be maintained or followed" (*Id.* at 18-21). These claims ignore the clear statutory language of § 7413(c)(2)(C), which provides criminal penalties for the acts alleged in the Indictment.

### 1.    Under its Plain Meaning, § 7413(c)(2)(C) Applies to All of the Clean Air Act, Including Subchapter II.

The Clean Air Act is codified as Chapter 85 of Title 42 of the United States Code and includes subchapters that address various sources and types of air pollution. For example, sections within Subchapter I address ground level ozone, carbon monoxide, particulate matter, and other pollutants of concern. 42 U.S.C. §§ 7501 to 7514a. Notably, Subchapter I contains provisions relating to mobile sources as well as stationary sources. Subchapter II sets forth additional requirements for motor vehicles and aircraft as well as fuel standards. §§ 7521 to 7590. These include

prohibitions on selling defeat devices and tampering with monitoring devices. § 7522(a)(3). Subchapter IV includes provisions for acid rain control, while Subchapter VI contains provisions for protection of the stratospheric ozone layer. 42 U.S.C. §§ 7651 to 7651; and §§ 7671 to 7671q. However, as explained below, 42 U.S.C. § 7413(c)(2)(C)'s criminal tampering provision applies to the entire Act, and the fact that specific conduct is a civil violation under the Act does not mean it cannot also constitute a criminal violation. Here, Congress specifically enacted a regulatory scheme that includes criminal enforcement.

### a. Section 7413(c)(2)(C) Applies to the Entire Act.

All of the Act's criminal enforcement provisions are in Subchapter I. *See* 42 U.S.C. § 7413(c). Some provisions include penalties for violating Subchapters of the Act. § 7413(c)(1) and (3). In contrast, by its plain terms, the false statement, tampering, and failure to notify provisions of § 7413(c)(2) apply to all portions of the Act, regardless of subchapter. With respect to tampering under § 7413(c)(2), Congress has provided for criminal penalties where any person knowingly:

> [F]alsifies, tampers with, renders inaccurate, or fails to install any monitoring device or method required to be maintained or followed *under this chapter*.

§ 7413(c)(2)(C) (emphasis added). The reference to "this chapter" in the criminal enforcement section refers to all of Chapter 85, i.e., the Clean Air Act. Thus, the criminal sanctions in § 7413(c)(2)(C) "facially apply to any person who tampers with any monitoring device required under 'this chapter'—the entire [Act]—including any monitoring device required under Subchapter II." *United States v. Coiteux*, 2024 U.S. Dist. LEXIS 82510, at *5 (W.D. Wash. May 6, 2024).

Congress means what it says, and the "plain meaning of a statute controls where that meaning is unambiguous." *Khatib v. Cnty. of Orange,* 639 F.3d 898, 902 (9th Cir. 2011) (*en banc*). "Where the language is plain and admits of no more than one meaning the duty of interpretation does not arise and the rules which are to aid doubtful meanings need no discussion." *Caminetti v. United States*, 242 U.S. 470,

485 (1917). Consistent with this bedrock principle of statutory interpretation, courts have repeatedly rejected arguments that the tampering provision excludes violations under subchapter II. *See Coiteux*, 2024 U.S. Dist. LEXIS 82510, at *5; *United States v. Carroll*, 2024 U.S. Dist. LEXIS 158668, at *2-5 (E.D. Mo. Sep. 4, 2024); *United States v. Long*, , 2024 U.S. Dist. LEXIS 203576, at *10-11 (E.D. Va. Nov. 7, 2024). Defendants make the same claim here (ECF No. 178 at 23-24), and this Court should likewise dismiss it.

### b. Civil Violations of the Act Do Not Preclude Criminal Violations.

Defendants' argument that Subsections 7413(a)(3)(D) and (f) exclude Subchapter II violations (ECF No. 178 at 23) erroneously conflates the criminal provision under Subchapter I with the civil provisions under Subchapter II. Subsections 7413(a)(3)(D) and (f) expressly incorporate violations "of, any other requirement or prohibition of this subchapter," i.e., Subchapter I, which includes the criminal tampering provision.

Defendants also claim that because the alleged conduct may be a civil violation under Subchapter II, the criminal provisions of the Act cannot apply. ECF No. 178 at 23. However, whether they violated one or more civil provisions of the Act does not mean that they did not also commit a crime under § 7413(c)(2)(C). As with nearly all environmental statutes, including the Clean Air Act, both can be true. *See*, *e.g.* § 7524(c)(3)(B) ("No action by the Administrator under this subsection shall affect any person's obligation to comply with any section of this chapter."); 7 U.S.C. § 136l(a) and (b) (identifying both civil and criminal enforcement remedies for the same provisions of the Federal Insecticide, Fungicide, and Rodenticide Act); 33 U.S.C. § 1319(a)(3) and (c)(1), (2) (identifying both civil and criminal enforcement for the same provisions of the Clean Water Act). The difference between civil and criminal environmental violations is often not the substance of the conduct but rather the mens rea. *See id.*

Because Congress deemed accurate monitoring and reporting to be fundamental to the enforceability of the Clean Air Act, it provided criminal sanctions under § 7413(c)(2)(C) for knowingly tampering with any monitoring device, as well as false statements or failures to notify. 42 U.S.C. § 7413(c)(2)(A)-(C). There is no basis to conclude that Defendants' conduct must be punished under one provision of the Act, to the exclusion of the other. Indeed, "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). *See Coiteux*, 2024 U.S. Dist. LEXIS 82510, at *10 ("The Government may be well within its rights to also seek the civil penalties detailed in Subchapter II, but it is not restricted to them where it alleges someone violated the tampering provision."); *accord Long*, 2024 U.S. Dist. LEXIS 203576, at *14-15.

### c. Congress Enacted a Regulatory Scheme that Included Criminal Enforcement.

Defendants emphasize the purported "absurdity" of "the government's novel interpretation" that "ripping out the catalyst and every other piece of a vehicle's emissions control system" is only a civil offense under Subchapter II, but "disabling a vehicle's check engine light is a felony." ECF No. 178 at 26. Not only do Defendants mischaracterize the critical function performed by OBDs—monitoring emissions controls to ensure their operability—they also ignore the primary importance that Congress placed on accurate monitoring and reporting. The legislative history of the Clean Air Act is silent as to why Congress chose to make tampering with emission controls a civil violation under § 7524. However, the history is clear as to why Congress particularly specified that tampering with monitoring devices is a criminal offense under § 7413.

In 1990, when § 7413(c)(2) was amended, Congress expanded its scope, emphasizing the importance of accurate reporting and monitoring to the Clean Air Act's regulatory scheme, and specified that all sources were expected to comply:

[T]he bill amends section 113(c)(2) (redesignated as section 113(c)(4)) by adding criminal liability for knowing omissions of material information, knowing failures to take required actions, and knowing alterations of monitoring devices. Such liability is especially important for self-monitoring statutes like the Clean Air Act. EPA's ability to oversee the regulated community under the Act is dependent to a large degree upon compliance by *each source* with reporting, record-keeping, and monitoring requirements.

S. Rep. No. 101-228 at 226 (1990) (emphasis added).

OBDs are monitoring devices and are required under the Act because they are critical to maintaining its enforceability. By tuning OBDs, violators can conceal the disabling of emission controls, making it difficult to detect and take enforcement action against this illegal conduct. This is the exact subversion that Congress sought to address under § 7413(c)(2)(C). The fact that Congress did not also criminalize tampering with emission controls does not detract from the importance that Congress placed on maintaining the integrity of monitoring devices that it required to be maintained and followed.

### d.  Courts Have Already Rejected Application of the Rule of Lenity to § 7413(c).

Defendants contend that the rule of lenity demands dismissal of the charges. ECF No. 178 at 24-25. However, "the rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended[.]" *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (internal quotation marks omitted). There is no guessing here. As other courts have already concluded, Congress plainly stated the tampering prohibition applies to monitoring devices required under the entire Clean Air Act, including Subchapter II, and as such, the Court need not reach this argument. *See Coiteux*, 2024 U.S. Dist. LEXIS 82510, at *11 (declining to address defendants' arguments about the rule of lenity); *Long*,

1  2024 U.S. Dist. LEXIS 203576, at *16-17 (holding that "the rule of lenity does not
2  apply" to § 7413(c)(2)(c)).

3      Moreover, none of the regulatory materials Defendants cite provide any
4  evidence of ambiguity in the statute. Defendants' reference to EPA's civil
5  regulations regarding civil violations are irrelevant to the Act's criminal tampering
6  provision. *See* ECF No. 178 at 25, citing 40 C.F.R § 1068.125; 88 Fed. Reg. 4296
7  (2023).  Likewise, Defendants cite other materials which are read out of context and
8  do not address the criminal tampering provision. *See* ECF No. 178 at 14-15, citing
9  Kathleen A. Hughes, EPA Memorandum to Regional Criminal Enforcement
10  Counsels, re: New Criminal Enforcement Responsibilities Under 1990 Clean Air
11  Act Amendments 6 (Apr. 19, 1993); and EPA, Clean Air Act Amendments of 1989,
12  Section by Section Analysis, p. 60 (July 1989).

13      While Defendants' motion fails purely as a matter of law, it bears noting that
14  their various references to purported "inequity of criminalizing minor actors" and
15  being "ambush[ed]" (ECF No. 178 at 25, 27) have no basis in the facts either. As set
16  forth in the Indictment, Defendants in this case operated a multi-million dollar
17  conspiracy with ample knowledge that their conduct violated both civil and criminal
18  prohibitions. Communications throughout the conspiracy show that Defendants
19  regularly discussed the fact that their conduct was illegal and Defendants took efforts
20  to evade EPA enforcement. (ECF No. 1, ¶ 43n-o, s, v, gg-rr). Further, they were
21  expressly notified in 2019 that a federal government grand jury was investigating
22  the same misconduct (*Id.*, ¶ 43l), and in 2021, that "selling those pipes to a person
23  to do those modifications is also a crime in the United States" (*Id.*, ¶ 43kk).
24  Defendants nevertheless continued their lucrative criminal tampering conspiracy.
25  "The requirement that statutes give fair notice cannot be used as a shield by one who
26  is already bent on serious wrongdoing." *United States v. Watson,* 118 F.3d 1315,
27  1318 (9th Cir. 1997) (quoting *United States v. Griffin,* 589 F.2d 200, 207 (5th Cir.
28  1979).

**2.    Onboard Diagnostic Systems are Monitoring Devices Under the Act.**

It is a felony offense for anyone to knowingly falsify, tamper with, or render inaccurate "*any* monitoring device or method required to be maintained" under the Clean Air Act. 42 U.S.C. § 7413(c)(2)(C) (emphasis added). The Onboard Diagnostic system (OBD), which is essentially a software component of a computer installed on every vehicle to ensure compliance with emission standards, is a monitoring device.  Therefore, tampering with an OBD is a felony under the Clean Air Act.

**A. Plain Meaning of "Monitoring Device".**

The Act does not define the term "monitoring device." However, when words are not defined, "statutory terms are generally interpreted in accordance with their ordinary meaning." *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (citation omitted). Dictionary definitions are a "usual source that might shed light on the statute's ordinary meaning." *Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427, 434 (2019). The Merriam-Webster Dictionary defines the verb "monitor" to mean "to watch, keep track of, or check usually for a special purpose."[1] Merriam-Webster defines the noun "device" to mean "a piece of equipment or mechanism designed to serve a special purpose or perform a special function."[2] Applying normal rules of grammar, where "monitoring" is an adjective modifying the noun "device," the ordinary meaning of a "monitoring device" is, therefore, a piece of equipment or mechanism designed to perform the special function to watch, keep track of, or check.

---

[1] *Maintain*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/maintain (last visited November 9, 2025).

[2] *Device*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/device (last visited November 9, 2025).

UNITED STATES' RESPONSE TO MOTION TO DISMISS - 13

Congress required the EPA to promulgate regulations requiring manufacturers to install on all new light duty vehicles and light duty trucks diagnostic systems capable of "accurately identifying for the vehicle's useful life . . . emission-related systems deterioration or malfunction, including, at a minimum, the catalytic converter and oxygen sensor, which could result in failure of the vehicles to comply with emission standards established under this section." 42 U.S.C. § 7521(m)(1)(A). Congress provided authority to EPA to do the same for heavy-duty vehicles and engines. *Id.*

A Senate report explained the purpose of requiring diagnostic systems for emissions controls under Section 7521(m)(1)(A):

> Since 1981, manufacturers of motor vehicles have started to install on many vehicle models an onboard computer and memory system which is used to *monitor* and control engine systems . . . Federal regulations are necessary to assure that the substantial benefits of ECD [emission control diagnostics] are achieved nationwide. Specifically, Federal regulations should require the *monitoring* and diagnosis of the catalyst, oxygen sensor, exhaust gas recirculation system, evaporative emission control system, auxiliary air system, and the fuel metering and ignition systems.

S. Rep. No. 101-228, at 96-97 (1989) (emphases added). The D.C. Circuit relied upon this legislative history when it described the monitoring function of OBDs: "OBDs *monitor*, control, and record the emissions released by automobile engines." *Motor Equipment & Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 453 n.3 (D.C. Cir. 1998) (emphasis added) (citing S. Rep. No. 101-228 at 97).

Moreover, Congress used the terms "monitors" and "device" when defining OBDs elsewhere in the Clean Air Act. Section 7541(i)(2), which sets forth warranty requirements for particular vehicles and their emissions components, provides, "[f]or purposes of this paragraph, 'onboard emissions diagnostic device' means any *device* installed for the purpose of storing or processing emissions related diagnostic information, but not including any parts or other systems which it *monitors* except

1    specified major emissions control components." 42 U.S.C. § 7541(i)(2) (emphases

2    added). This language plainly demonstrates that Congress considered OBDs to be

3    "devices" that "monitor" emissions control components or other systems.

4        Under the authority that Congress provided in 42 U.S.C. § 7521(m)(1), EPA

5    subsequently promulgated regulations requiring that light-duty vehicles and trucks

6    and certain heavy duty vehicles "be equipped with an onboard diagnostic (OBD)

7    system capable of *monitoring* all emission-related power train systems or

8    components during the applicable useful life of the vehicle." 40 C.F.R. § 86.1806-

9    05(a)(1) (emphasis added). The regulations further explain that "[t]he OBD system

10   must detect and identify malfunctions in all *monitored* emission-related powertrain

11   systems or components." *Id.* at § 86.1806-05(a)(3) (emphasis added).

12        If Congress had intended to exclude OBDs from coverage under the criminal

13   tampering provision, § 7413(c)(2)(C), when it enacted 42 U.S.C. § 7521(m)(1), it

14   could have done so. Instead, at the same time that Congress enhanced the penalty

15   for tampering with "monitoring devices" under § 7413(c)(2)(C) from a misdemeanor

16   to a felony, it enacted § 7521(m)(1), instructing EPA to implement regulations

17   requiring the installation of OBDs for the purpose of "monitoring" emission control

18   systems. S. Rep. No. 101-228, at 96-97 and 226-(1989).

19        "We presume Congress is aware of existing law when it passes legislation."

20   *Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014). Here,

21   Congress was obviously aware that § 7413(c)(2)(C) broadly applied to "*any*

22   monitoring device," while at the same time mandating that OBDs be capable of

23   *monitoring* emission control systems in 42 U.S.C. § 7521(m)(1). Both the statutory

24   language and legislative history show that Congress considered OBDs to be

25   "monitoring devices" and intended that tampering with OBDs would be subject to

26   the criminal tampering provision.

27       **B. Defendants' Interpretation Ignores the Plain Meaning and Statutory**
          **Scheme Enacted by Congress.**

28

Defendants argue that the term "monitoring device" in §7413(c)(2)(C) should be defined to refer solely to equipment that monitors "emissions or data of emissions output," ECF No. 178 at 21-22, as opposed to the functioning of emission-related components. However, Defendants do not point to any definition of "monitoring device" in the Act containing such a limitation. Instead, they cite a variety of statutory and regulatory provisions related to the monitoring of emissions. ECF No. 178 at 21. The mere fact that the Act at times calls for monitoring of emissions in no way supports the claim that any reference to monitoring in the statute can *only* apply to monitoring end-of-pipe emissions.

Every court that has encountered the argument that the OBD system is not a "monitoring device" under the Act has rejected it. *See Long*, 2024 U.S. Dist. LEXIS 203576, at *10-11 ("Nothing in the text of Section 113(c)(2)(C) suggests that the statute applies only to devices that monitor emissions. … Because OBD systems monitor the functionality of other emissions systems, they qualify as 'monitoring device[s]' under Section 113(c)(2)(C)."); *Coiteux*, 2024 U.S. Dist. LEXIS 82510, at *8 ("The Court concludes that an OBD is a monitoring device for purposes of the tampering provision."); *Carroll*, 2024 U.S. Dist. LEXIS 158668, at *4-5 ("Defendants' arguments do not persuade the Court that *Coiteux* is wrong or that OBDs are not monitoring devices within the meaning of the CAA."). This Court should as well.

### 3.    Onboard Diagnostic Systems are Required to be Maintained or Followed.

Defendants argue that there was no criminal violation because the Act does not require an OBD to be "maintained." ECF No. 178 at 18-21. Defendants acknowledge that Congress required manufacturers to install OBDs under 42 U.S.C. § 7521(m)(1) but argue that the Act does not create an obligation "that anyone—not a manufacturer, service provider, or owner—maintain an OBD system." ECF No. 178 at 19. This claim ignores the Clean Air Act's various statutory requirements

1  applicable to manufacturers and all other persons (including service providers and
2  owners) that require preservation of the OBD.

3      Courts interpret statutes to give effect to all parts of the statute. *See TRW Inc.*
4  *v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory
5  construction that a statute ought, upon the whole, to be so construed that, if it can be
6  prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.")
7  (citation and internal quotation marks omitted). "It is also an established canon of
8  statutory construction that a legislature's words should never be given a meaning
9  that produces a stunningly counter-intuitive result—at least if those words, read
10 without undue straining, will bear another, less jarring meaning." *United States v.*
11 *O'Neil*, 11 F.3d 292, 297 (1st Cir. 1993).

12     When Congress enacted the Clean Air Act, legislators sought to ensure that
13 motor vehicles would meet applicable emission standards not only at the time of
14 manufacture and initial sale but thereafter in everyday use. *See, e.g.*, 116 Cong. Rec.
15 33093 (1970), reprinted at Leg. Hist. 330 ("what we are concerned about is not only
16 the tests or standards that the cars meet while they are in the factory, but also whether
17 or not they continue to meet these standards afterward") (statement of Senator
18 Muskie). If OBDs were not required to be maintained, that purpose—to ensure
19 operability of emissions controls and compliance with emissions standards—would
20 be thwarted. Consequently, Congress set forth a comprehensive statutory scheme
21 requiring that OBDs be maintained to monitor the functioning of emissions controls.

22     Manufacturers are forbidden from selling new vehicles without an EPA
23 certificate of conformity (COC) verifying that the vehicle meets Clean Air Act motor
24 vehicle emission standards, including the OBD requirements. 42 U.S.C. §
25 7522(a)(1). The standards verified through a COC include the emissions control
26 diagnostics standards required by § 7521(m)(1) and its implementing regulations.
27 Section 7521(m)(1) requires EPA to establish regulations requiring the installation
28 of an OBD system on all medium and light duty trucks and authorizes EPA to require

OBD systems on heavy-duty trucks or engines. EPA thus issued the OBD regulations found at 40 C.F.R. Part 86.

Further, manufacturers must ensure the OBD systems, once installed, continue to function properly. Section 7521(m)(1)(A) requires OBD systems that identify emissions-related systems deterioration or malfunction "for the vehicle's useful life." 42 U.S.C. § 7521(m)(1)(A). "Useful life" is defined by regulation as a set number of years or miles for various categories of vehicles and engines, generally ranging from 10 to 15 years or 120,000 to 150,000 miles. 40 C.F.R. §§ 86.1805-17; 1036.104(e).

During a vehicle's useful life, EPA can compel a manufacturer to ensure continued functionality of OBDs. If EPA determines that a substantial number of any class or category of vehicles, although properly maintained and used, do not meet emission standards when in actual use, EPA can require the manufacturer to submit a plan to remedy the nonconformity at the manufacturer's expense. *See* 42 U.S.C. § 7541(c)(1). For example, in 2005, Chrysler was required to recall and recalibrate the OBD systems on vehicles manufactured between 1996 and 1998 because they did not properly detect catalytic converter failure. *See* https://www.justice.gov/archive/opa/pr/2005/December/05_enrd_688.html. This establishes a manufacturer's responsibility to ensure that an OBD system is capable of functioning accurately for at least the useful life of the vehicle and demonstrates that the manufacturer has an obligation to maintain such systems.

Manufacturers are also required to warrant, at the time of sale and to each subsequent purchaser, that the vehicle or engine is "free from defects in materials and workmanship which cause such vehicle or engine to fail to confirm with applicable regulations" for the warranty period. 42 U.S.C. § 7541(a)(1). For example, on new light-duty vehicles and engines manufactured in the model year 1995 and thereafter, the warranty period for any "specified major emission control

component," including OBDs[3] is 8 years or 80,000 miles, whichever comes first. § 7541(i)(2). In other words, an OBD failure is also a warranty violation, and manufacturers are accountable to vehicle purchasers and are required to maintain OBDs through the warranty program. § 7541(a).

Congress also set out OBD requirements that are not limited by reference to a vehicle's useful life or warranty period. Subsections 7521(m)(1)(B)-(D) require, without temporal limitation, that the OBD system remain capable of alerting the vehicle's owner or operator to the likely need for maintenance or repair of emission-related components, storing and retrieving fault codes, and providing access to stored information as required in EPA regulations. § 7521(m)(1)(B)-(D). These provisions ensure that regulated vehicles meet applicable emission standards not only at the time the vehicle was sold, but also in everyday use after the sale.

Further, there is a statutory prohibition on removing or rendering inoperative an OBD. § 7522(a)(3)(A). That prohibition, which extends to "any person," establishes that an OBD is "required to be maintained or followed" under the Act because it must be preserved and cannot be removed or rendered inoperative. § 7413(c)(2)(C).

The Clean Air Act does not define the phrase "required to be maintained." Merriam-Webster Dictionary defines "maintain" as "to keep in an existing state (as of repair, efficiency, or validity): preserve from failure or decline." This definition is clearly broad enough to encompass the Clean Air Act's OBD requirements.

Defendants ask this Court to violate well-established cannons of statutory construction by ignoring the Clean Air Act provisions requiring manufacturers to ensure that an OBD functions properly (i.e., is maintained), and prohibiting the

---

[3] "Specified major emission control component" is defined to include "any device installed for the purpose of storing or processing emissions relation diagnostic information." 42 U.S.C. § 7541(i).

disabling of an OBD by any person, to adopt a strained and illogical reading of "maintain." Congress's entire regulatory scheme would be thwarted if OBDs were not required to be maintained. It simply makes no sense for Congress to require manufacturers to install OBDs, require OBDs to perform very specific functions, and prohibit the disabling of OBDs yet not require OBDs to be maintained within diesel trucks. But even if the Court disagreed with the plethora of instances showing that OBDs are required to be maintained and accepted Defendants' argument that tampering with OBDs is not a crime because there is no affirmative requirement to maintain OBDs, Defendants' arguments still fail. That is because Defendants have ignored the disjunctive clause of § 7413(c)(2)(C): it is a crime if a person knowingly "falsifies, tampers with, renders inaccurate, or fails to install any monitoring device **or method** required to be maintained **or followed** under this chapter."

There is no dispute that the Clean Air Act requires manufacturers to install OBDs on diesel trucks. ECF No. 178 at 19; 42 U.S.C. § 7521(m)(1). As outlined above, there is a host of statutory requirements to ensure that the OBD methodology of monitoring emissions is followed during the life of the vehicle. The Act also specifically prohibits any person from manufacturing, selling, or installing any part where the principal effect is to "bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle . . ." 42 U.S.C. § 7522(a)(3)(B). In short, the statute is unambiguous that the methodology of utilizing an OBD to monitor emissions is required to be followed. It is absurd to suggest that the Congress required OBDs to be installed on vehicles as a methodology to monitor emissions and prohibited them from being rendered inoperable but simultaneously did not intend for an OBD to be a methodology that is required to be followed for purposes of § 7413(c)(2)(C). Such a reading strains the plain language of Congress beyond the breaking point. For these reasons, the Court should reject Defendants' arguments that an OBD is not a monitoring device or method required to be maintained or followed under § 7413(c)(2)(C).

**B.    The Defeat Devices Are Prohibited by Statute and Are Contrary to Law for Purposes of the Smuggling Charges.**

Defendants conflate distinct issues to present a muddled argument that the defeat devices are not contrary to law—despite being specifically outlawed by statute—and, therefore, should not be subject to a smuggling charge. Defendants' arguments lack any basis in caselaw or statute, and the Court should reject their request to dismiss the charges arising under 18 U.S.C. § 545.

Paragraph 2 of 18 U.S.C. § 545 provides the relevant statement of law for the Indictment:

> Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law . . .

18 U.S.C. § 545.  A defendant can violate 18 U.S.C. § 545, paragraph 2 in one of two ways: the defendant can either "fraudulently or knowingly import or bring in the United States, any merchandise contrary to law," or the defendant can "receive[], conceal[], buy[], sell[], or in any manner facilitate the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law."

Defendants attempt to commingle two distinct issues to invent an argument for the charges arising under 18 U.S.C. § 545.  First, Defendants rely upon *United States v. Alghazouli*, 517 F.3d 1179 (9th Cir. 2008), to argue about the circumstances when a violation of a regulation constitutes being "contrary to law" under 18 U.S.C. § 545.  This argument is a red herring—the Clean Air Act prohibits the sale, manufacture, or installation of defeat devices by the terms of the statute, not by regulation.  Second, Defendants argue that a separate statute must specifically make the importation of defeat devices illegal.  In other words, Defendants argue that even though the devices are illegal to sell or manufacture, the devices are not "contrary to

UNITED STATES' RESPONSE TO MOTION TO DISMISS - 21

law" under 18 U.S.C. § 545 because another statute besides § 545 does not make the devices illegal to import.  Such a reading of the statute has no support in case law and would violate well-established cannons of statutory construction.  When these arguments are untangled from Defendants' motion, it is clear that both arguments fail.

**1.  Defendants' focus on regulations is misplaced.**

Defendants spend much time and effort analyzing whether violating a regulation constitutes being "contrary to law" under 18 U.S.C. § 545, but that analysis is irrelevant here.  The sale, manufacture, or installation of defeat devices is prohibited by statute, not regulation.  As discussed at length above, under 42 U.S.C. § 7522, titled "Prohibited Acts," it is illegal for

> any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use.

42 U.S.C. § 7522(a)(3)(B).  In other words, the defeat devices sold by Defendants are prohibited under the Clean Air Act.

Unsurprisingly, the Defendants do not cite any case that stands for the proposition that merchandise can be considered *not* contrary to law under 18 U.S.C. § 545 when it is made illegal by statute.  Defendants do, however, spend much effort to discuss the parameters of when a regulation can render merchandise contrary to law, which is not the issue here.  For instance, in *United States v. Alghazouli*, 517 F.3d 1179 (9th Cir. 2008), the Ninth Circuit concluded "that Congress intended the term 'law' in § 545 to include a regulation when, but only when, a statute (a 'law') specifies that a violation of that regulation constitutes a crime."  *Alghazouli*, 517 F.3d at 1183.  The issue in *Alghazouli* was whether the defendant's violation of a regulation, 40 C.F.R. § 82.4, could constitute violation of a "law" under 18 U.S.C. §

545. The Ninth Circuit concluded that it did because a statute—in this case, the Clean Air Act—specified that violation of 40 C.F.R. § 82.4 is a crime.

In contrast, 42 U.S.C. § 7522 makes the sale, manufacture, or installation of defeat devices illegal within the statute itself. Thus, the Ninth Circuit's reasoning in *Alghazouli* is inapplicable here.

Defendants have not identified any case that holds that a statute that prohibits and makes illegal certain merchandise does not render that merchandise contrary to law under 18 U.S.C. § 545. Therefore, the Defendants' arguments regarding regulations are not relevant here.

**2. Defendants' assertion that a separate statute must criminalize importation of defeat devices is not supported by statute or caselaw.**

Defendants cannot cite to a single case to support their assertion that a separate statute from 18 U.S.C. § 545 must specifically make particular merchandise illegal to import before it can be considered "contrary to law" for purposes of 18 U.S.C. § 545. In effect, Defendants are attempting to impose another requirement on a charge arising under 18 U.S.C. § 545 that the courts and Congress never intended to impose. Moreover, Defendants' reading of the statute would violate a well-established cannon of statutory construction by making 18 U.S.C. § 545 essentially superfluous.

Defendants summarize the gist of their argument as this: "Although Title 42, United States Code, Section 7522(a)(3)(B) prohibits ***manufacturing, selling, and installing*** defeat devices and delete tuners, it does not prohibit the ***importation of them into the United States***." ECF No. 178 at 27 (emphasis in the original). Defendants fail to cite to a single case that imposes the requirement that a statute other than 18 U.S.C. § 545 must specifically outlaw importation of merchandise before it can be considered contrary to law under § 545.

The United States is unaware of another case within the Ninth Circuit where a court has had to confront this issue, but the Seventh Circuit rejected a similar argument in *United States v. Heon Seok Lee*, 937 F.3d 797 (7th Cir. 2019). In *Heon*

*Seok Lee*, the defendant was convicted of smuggling industrial fans from South Korea into the United States by falsely representing that the fans were manufactured in the United States through "Assembled in U.S.A." placards that were affixed to the fans in violation of 19 U.S.C. § 1304(a). *Id*. at 801 – 802. In his appeal of his conviction on the smuggling charges, the defendant made an argument that is identical to the one made by Defendants in this case: "According to [defendant], the words 'imports . . . merchandise contrary to law' in § 545 mean that the merchandise itself is per se illegal to import, not merely that the merchandise was imported in a condition noncompliant with some federal law or regulation somewhere." *Id*. at 812. The defendant pointed to the title of § 545, "Smuggling goods into the United States," to argue that "the word 'smuggling' refers exclusively to bringing on shore goods whose importation is categorically prohibited." *Id*. The Seventh Circuit rejected this interpretation and found that "the text of the statute is not so cabined when examined in its entirety." *Id*. The Seventh Circuit held that "[t]he better reading of the second paragraph of § 545 is that it makes it a crime to fraudulently or knowingly import merchandise in any manner contrary to law." *Id*. at 813.

Notably, the Seventh Circuit also rejected the defendant's argument that because the predicate violation of 19 U.S.C. § 1304 did not criminalize his conduct, then he cannot be found guilty of violating 18 U.S.C. § 545. In rejecting this argument, the Seventh Circuit held "[t]he fact § 1304(l) does not separately criminalize conduct already outlawed under § 545 is not a basis for limiting the scope of § 545." *Id*. at 814. Thus, any arguments Defendants might make about 42 U.S.C. § 7522 not including a criminal penalty also fail.

It is also worth noting that § 545 prohibits the sale of merchandise that is contrary to law. The sale of defeat devices is also prohibited under 42 U.S.C. § 7522. The Indictment alleges a clear scheme where the Defendants would smuggle defeat devices into the United States from Canada and then sell them to individuals within the United States. There should be no question that these devices are contrary to law

for purposes of 18 U.S.C. § 545. Moreover, Defendants brought the illicit merchandise into the United States in furtherance of the criminal tampering conspiracy, further rendering the merchandise "contrary to law." Indeed, Defendants routinely discussed the illegality of their conduct (ECF No. 1, ¶ 43o, gg-rr), including with respect to importing the defeat devices (*Id.*, ¶ 43cc, 54c, 54f).In light of the Defendants' failure to identify any case law that supports the notion that a statute separate from 18 U.S.C. § 545 must categorically prohibit importation of a specific article of merchandise before it can be considered "contrary to law," the Court should follow the reasoning of the Seventh Circuit and reject Defendants' arguments.

Finally, Defendants' interpretation requiring a second statute to categorically prohibit importation of a specific piece of merchandise before it is prohibited from importation under 18 U.S.C. § 545 violates the well-established statutory cannon that courts should not interpret statutes to render sections of a statute superfluous. *See e.g., Tulelake Irrigation Dist. v. United States Fish & Wildlife Serv.*, 40 F.4th 930, 936 (9th Cir. 2022) ("When construing a statute, courts should avoid any statutory interpretation that renders any section superfluous."). Defendants are in effect asking the Court to find that another statute is required to prohibit what § 545 already prohibits—rendering § 545 superfluous. This interpretation should fail because it reads words into the statute that do not exist and would make the terms of § 545 superfluous. As the Seventh Circuit observed in *Heon Seok Lee*, "[a] violation of § 545 requires a violation of another law—the predicate offense if you will—done with a fraudulent or knowing mindset"—not the superfluous requirement that another statute prohibit what is already prohibited in § 545. *Heon Seok Lee*, 937 F.3d at 812.

Defendants' references to emails EPA civil inspector Victor Aguilar sent while performing a civil investigation that "the EPA violation is not the importation of the product, but the sale of the product to someone in the U.S." (ECF No. 178 at

27, 33), provide no support for their argument. In those emails, Mr. Aguilar accurately summarized the civil violations that he was investigating under 42 U.S.C. § 7522. As set forth above, it is the smuggling statute, 18 U.S.C. § 545, which criminalizes importation of defeat devices.

For these reasons, the Court should deny Defendants' motion to dismiss based upon their contention that 18 U.S.C. § 545 requires a separate statute to categorically prohibit importation of defeat devices before the defeat devices are considered "contrary to law" under § 545.

### 3. The Indictment identifies the statute that makes defeat devices contrary to law.

The Defendants are wrong when they assert "the Indictment fails to identify a predicate law for the 'contrary to law' elements of Counts Three through Five." ECF No. 178 at 29. The Defendants are correct that an indictment must allege which law makes the merchandise being smuggled "contrary to law." This requirement was established well over a century ago in the statutory predecessor to 18 U.S.C. § 545: "The generic expression, 'import and bring into the United States,' did not convey the necessary information, because importing merchandise in not per se contrary to law, and could only become so when done in violation of specific statutory requirements." *Keck v. U.S.*, 172 U.S. 434, 437 (1899). The Supreme Court held that without identifying the predicate statutory violation, an indictment "did not sufficiently inform the defendant of the nature of the accusation against him." *Id.*

That is not the case here. The Indictment clearly identifies that selling, offering to sell, or installing a defeat device is contrary to law under 42 U.S.C. § 7522(a)(3)(B). ECF No. 1 at ¶ 27. It is not a coincidence that Defendants spend a signification portion of their motion discussing 42 U.S.C. § 7522. The Indictment also identifies in detail the various defeat devices that were smuggled into the United States. Defendants' motion to dismiss on this basis fails and should be dismissed.

### C. The Court Does Not Need to Address Defendants' Argument Regarding Money Laundering.

UNITED STATES' RESPONSE TO MOTION TO DISMISS - 26

Defendants' arguments regarding the money laundering charge in Count 6 of the Indictment are predicated entirely on the Court dismissing the other charges in the Indictment. Because the Court should deny the motion to dismiss for the reasons articulated in this motion, it does not need to reach this argument.

## VI.    CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny Defendants' motion.

DATED this 10th day of November, 2025.

S. Peter Serrano
United States Attorney

/s/ Jacob E. Brooks
Jacob E. Brooks
Frieda K. Zimmerman
Assistant United States Attorney
Gwendolyn Russell
Special Assistant United States Attorney

1

## **CERTIFICATE OF SERVICE**

2

3        I hereby certify that on November 10, 2025, I electronically filed the

4    foregoing with the Clerk of the Court using the CM/ECF system which will send

5    notification of such filing to noticed counsel.

6

7

8

9                                            /s/ Jacob E. Brooks
                                             Jacob E. Brooks
10                                           Assistant United States Attorney

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES' RESPONSE TO MOTION TO DISMISS - 28